UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――――――――
XERIANT, INC.,
                         Plaintiff,

      -v-

XTI AIRCRAFT CO., *et al.*,
                        Defendants.
―――――――――――――――――――――――――――――――

23-CV-10656 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Before this Court is Plaintiff and Counterclaim-Defendant Xeriant, Inc.'s motion to dismiss Defendant and Counterclaim-Plaintiff XTI Aircraft Company's ("XTI") Second Amended Answer and Counterclaim ("SAAC"). For the reasons that follow, Xeriant's motion is denied.

**I.    Background**

    **A.    Factual Background**

The following factual allegations are taken from XTI's SAAC and presumed true for the purpose of resolving Xeriant's motion to dismiss. *See Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013).

XTI is an aircraft company focused on developing a fixed-wing vertical takeoff and landing airplane called the TriFan 600. (ECF No. 71 ("SAAC") ¶ 204.) In April 2021, Xeriant approached XTI about XTI's TriFan 600 vertical takeoff and landing aircraft technology ("VTOL Technology") and proposed a joint venture arrangement. (*Id.* ¶ 205.) Subsequently, XTI and Xeriant entered into a Joint Venture Agreement (the "Agreement") and formed a 50/50 joint venture for the purpose of advancing the design and development of XTI's VTOL technology. (*Id.* ¶ 206.) "Under the [Agreement], XTI and Xeriant each held a 50% interest in

the [joint venture], and each party agreed to make certain contributions to the [joint venture] in exchange for that interest." (*Id.*) Xeriant appointed three of the five members of the joint venture's management committee, giving it majority control. (*Id.* ¶ 209.)

XTI alleges in the SAAC that Section 4.3 of the Agreement obligated Xeriant to contribute a total of $10 million in funding to the joint venture, with $1 million paid upon execution of the agreement and the remaining $9 million paid on a monthly basis until the end of 2021. (*Id.* ¶ 207.) In exchange, XTI granted the joint venture a license to use its VTOL Technology for the duration of the venture. (*Id.* ¶ 208.) But Xeriant paid only approximately $5.4 million of the promised funding and ceased payment around December 2021. (*Id.* ¶ 210.)

XTI further alleges that Xeriant "did not substantially provide" the joint venture with access to its network of aerospace advisors and consultants or to potential investors or purchasers of the TriFan 600 aircraft, as required under Sections 4.3.4 through 4.3.7 of the Agreement. (*Id.* ¶ 212.) Likewise, XTI alleges that Section 4.3.3 of the Agreement required Xeriant to grant the joint venture a license to its technology, know-how, and patents for use in the project, but that Xeriant did not deliver any such intellectual property to the joint venture. (*Id.* ¶ 213.)

Due to Xeriant's failure to complete the $10 million payment, the joint venture was undercapitalized by early 2022 and in need of external financing. (*Id.* ¶ 214.) XTI alleges that Xeriant had the opportunity to introduce XTI to a prospective merger or financing partner, Inpixon, Inc., and that Xeriant had an obligation to make such introductions in support of the joint venture. (*Id.*) However, Xeriant conditioned the introduction on the execution of a letter agreement ("May 17 Letter") that imposed "one-sided terms" providing Xeriant with "millions in equity and the extinguishment of millions more in debt" if XTI and the potential partner entered into a business combination within one year. (*Id.* ¶¶ 214, 216.) XTI alleges that it signed the

letter agreement on May 17, 2022, under financial pressure. (*Id.* ¶ 215.) XTI further alleges that, although it did ultimately proceed to engage with Inpixon, no transaction occurred within the one-year period set forth in the May 17 Letter, and therefore the terms of the May 17 Letter had expired. (*Id.* ¶ 217.) Notwithstanding the expiration of the May 17 Letter, Xeriant has claimed ongoing entitlement to compensation from XTI's merger with Inpixon. (*Id.*)

XTI alleges that Sections 2.2(ii) and 9.1.1 of the Agreement provided for automatic termination and dissolution of the joint venture two years after the Agreement's effective date if the joint venture failed to achieve a financing or merger "Liquidity Event," and Xeriant's funding default remained uncured. (*Id.* ¶ 218.) Upon termination, the Agreement provided for XTI to regain full rights and control over the VTOL Technology and other intellectual property and work product. (*Id.* ¶¶ 206, 219.) XTI alleges that the conditions for automatic termination were satisfied on May 31, 2023 (*Id.* ¶ 218), but that Xeriant refused to complete the steps required to transfer the VTOL Technology back to XTI and continues to publicly represent that it maintains an ongoing role in the development of TriFan 600 (*Id.* ¶ 220).

    **B.**    **Procedural Background**

Xeriant commenced this suit against XTI and various unnamed defendants on December 6, 2023, for breach of contract, fraudulent inducement, quantum meruit, unjust enrichment, unfair competition, and misappropriation of confidential information. (ECF No. 1; ECF No. 41.) XTI moved to dismiss certain counts of Xeriant's Second Amended Complaint (ECF No. 42), which this Court denied (ECF No. 48).

XTI subsequently filed an answer on January 28, 2025 (ECF No. 50), which it amended to add various counterclaims on February 18, 2025 (ECF No. 53). Xeriant moved to dismiss the amended answer and counterclaim. (ECF No. 60.) XTI then filed its SAAC on April 14, 2025. (SAAC.) The SAAC asserts that Xeriant breached the Agreement by failing to complete the $10

million payment, that Xeriant breached its fiduciary duty by acting disloyally in connection with the May 17 Letter and withholding funding and promised resources, and that XTI is entitled to declaratory judgment regarding the enforceability of the May 17 Letter, the termination of the Agreement, and the ownership of the VTOL Technology and other intellectual property developed through the joint venture.  (*See generally* SAAC.)  Xeriant then filed a motion to dismiss the SAAC (ECF No. 77) and a corresponding memorandum of law in support (ECF No. 78).  XTI opposed the motion to dismiss (ECF No. 82), and Xeriant replied in further support (ECF No. 83).

## II.     Legal Standard

"A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint." *Town & Country Linen Corp. v. Ingenious Designs LLC*, No. 18-CV-5075, 2020 WL 3472597, at *4 (S.D.N.Y. June 25, 2020) (quotation marks omitted).  "To survive a motion to dismiss, a [pleading] must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[T]he Supreme Court has established the following order to be followed in determining whether the pleading is adequate: 'When there are well-pleaded factual allegations, a court should assume their veracity and *then* determine whether they plausibly give rise to an entitlement to relief.'" *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679).  "The court must also construe all reasonable inferences that can be drawn from the [pleading] in the light most favorable to the [claimant]." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) (quotation marks omitted).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the [pleading], documents attached to the

[pleading] as exhibits, and documents incorporated by reference in the [pleading]." *DiFolco*, 622 F.3d at 111. "Where a document is not incorporated by reference, the court may never[the]less consider it where the [pleading] relies heavily upon its terms and effect, thereby rendering the document integral to the [pleading]." *Id.* (quotation marks omitted).

### III.    Discussion

#### A.    Breach of Contract

Count I of the SAAC asserts a breach of contract claim, alleging that Xeriant materially breached Sections 4.3.2 and 7.1 of the Agreement by contributing "only approximately $5.4 million of the $10 million it had committed." (SAAC ¶ 226.) The SAAC additionally alleges that XTI performed its obligations under the Agreement and provided Xeriant with notice of its default and an opportunity to cure the default. (*Id.* ¶¶ 225, 227.)

The terms of the Agreement, incorporated by reference into the SAAC, may be considered in resolving XTI's motion to dismiss.[1] *DiFolco*, 622 F.3d at 111. As relevant here, Section 4.3 of the Agreement provides that, "[i]n consideration of the [joint venture] interests granted to Xeriant, Xeriant shall contribute or provide . . . [a] total of $10 million . . ., consisting of the initial sum of $1,000,000 to be funded immediately upon the execution of this agreement," and "[a]dditional capital of $9,000,000 advanced monthly." (ECF No. 41-2 § 4.3.)

Delaware law governs the Agreement. (ECF No. 41-2 § 11.8.) "In order to survive a motion to dismiss for failure to state a breach of contract claim under Delaware law, applicable here, the plaintiff must demonstrate: first, the existence of the contract, whether express or

---

[1] The Court notes that Section 8.3 of the Agreement requires disputes arising out of the Agreement to "be settled exclusively by arbitration" if a mediator is not agreed upon or if mediation is not successful. (ECF No. 41-2 § 8.3.) However, neither party seeks to compel arbitration and the Court declines to do so *sua sponte*. *See PRL USA Holdings, Inc. v. United States Polo Ass'n, Inc.*, No. 14-CV-764, 2015 WL 1442487, at *3 n.2 (S.D.N.Y. Mar. 27, 2015).

implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *Keller Foundations, LLC v. Zurich Am. Ins. Co.*, 758 F. App'x 22, 25 (2d Cir. 2018) (alterations adopted) (quoting *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)). The SAAC satisfies all three requirements, as it demonstrates the existence of the Agreement and alleges that Xeriant breached Section 4.3 of the Agreement by failing to complete the $10 million payment. (*See* SAAC ¶ 210.) The SAAC also alleges resulting damages to XTI, including "the loss of the benefit of the full funding that Xeriant was obligated to provide, costs and delays incurred in seeking alternative financing for the project, [and] lost business opportunities[.]" (*Id.* ¶ 228.)

Xeriant contends that it did not breach the Agreement because Section 4.3 allowed it to contribute a lesser amount than $10 million. (ECF No. 78 at 14-18.) This argument is unavailing. Section 4.3 provides that "Xeriant *shall* contribute or provide . . . [a] total of $10 million" through a $1 million initial sum and then monthly payments on the remaining $9 million. (ECF No. 41-2 § 4.3 (emphasis added).) "In both contracts and statutes, the term 'shall' is used to make an act mandatory." *Zurich Am. Ins. Co. v. St. Paul Surplus Lines, Inc.*, No. CIV.A. 4095-VCP, 2009 WL 4895120, at *7 n. 55 (Del. Ch. Dec. 10, 2009), *as revised* (Apr. 14, 2010). Accordingly, Section 4.3 obligated Xeriant to pay the full $10 million.

Nothing in Section 4.3 or the rest of the Agreement rebuts this mandatory language. Xeriant relies in part on Sections 7.1 and 9.2.2 of the Agreement, which provide that XTI could terminate the Agreement upon non-payment by Xeriant and proper notice, and that, under such circumstances, Xeriant is still entitled to a pro rata share of XTI stock. (ECF No. 41-2 §§ 7.1, 9.2.2.) But these provisions govern XTI's right to terminate the Agreement and Xeriant's entitlement to shares in XTI stock—they do not bear on Xeriant's obligation to pay the full $10

million.  Indeed, the fact that Xeriant receives a pro rata equity interest in XTI, even in the event of nonpayment, does not itself nullify Xeriant's payment obligations.  Xeriant also relies on language in Section 4.3 clarifying that the payment is consideration for Xeriant's interest in the joint venture and that the monthly payments are "as and when required in accordance with the Budget."  (*Id.* § 4.3; *see* ECF No. 78 at 17.)  Again, this language does not dislodge Xeriant's obligation to pay the full $10 million.  Instead, it merely provides that Xeriant is to receive interest in the joint venture, which the SAAC alleges that it did (SAAC ¶ 206), and provides that the allotment of payments is in accordance with the budget.  In any event, "[i]n deciding a motion to dismiss, the trial court cannot choose between two differing reasonable interpretations of ambiguous provisions."  *VLIW Tech.*, 840 A.2d at 615.  Thus, even if Section 4.3 could be plausibly read in Xeriant's favor, Xeriant cannot prevail unless its "interpretation is the *only* reasonable construction as a matter of law."  *Id.*  That is not the case here, where Section 4.3 can reasonably be read to impose an obligation on Xeriant to pay $10 million.

Xeriant also argues that the breach of contract claim is time-barred.  (ECF No. 78 at 18.)  "Where jurisdiction rests upon diversity of citizenship, a federal court sitting in New York must apply the New York choice-of-law rules and statutes of limitations."[2]  *Leib-Podry v. Gates*, No. 24-CV-8510, 2025 WL 1795354, at *2 (S.D.N.Y. June 30, 2025) (quoting *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998)).  "Under New York's 'borrowing statute,' N.Y. C.P.L.R. § 202, a case filed by a non-resident plaintiff requires application of the shorter statute of limitations period . . . provided by either New York or the state where the cause of

---

[2] Although the Agreement selects Delaware law to govern the Agreement, it did not explicitly include statutes of limitations.  "Choice-of-law provisions in contracts do not apply to statutes of limitations, unless a provision expressly includes it.  If no provision expressly includes it, then the law of the forum applies."  *B.E. Cap. Mgmt. Fund LP v. Fund.com Inc.*, 171 A.3d 140, 147 (Del. Ch. 2017) (cleaned up).

action accrued." *Cantor Fitzgerald v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002). "[A] cause of action accrues at the time and in the place of the injury. Where, as here, the injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." *Id.* (quotation marks omitted).

Because XTI is a Delaware corporation with its principal place of business in Colorado (SAAC ¶ 200), N.Y. C.P.L.R. § 202 applies and requires a determination of whether New York or the state of accrual has the shorter statute of limitations. The parties agree that Colorado is the state of accrual. (ECF No. 78 at 19; ECF No. 82 at 7.) *Accord Luv N' Care, Ltd v. Goldberg Cohen, LLP*, 703 F. App'x 26, 28 n.1 (2d Cir. 2017) ("It would seem that an economic harm has greater effect on a for-profit enterprise's activities at its principal place of business rather than at its place of incorporation.").[3] New York law provides a six-year statute of limitations for contract claims. N.Y. C.P.L.R. § 213(2). Colorado, on the other hand, typically requires contract claims to be brought within three years of accrual, Colo. Rev. Stat. Ann. § 13-80-101(1)(a), but provides a six-year statute of limitations for "actions to recover a liquidated debt or an unliquidated, determinable amount of money," Colo. Rev. Stat. Ann. § 13-80-103.5(1)(a).

Xeriant argues that Colorado's three-year statute of limitations applies to XTI's breach of contract claim, such that the claim would be timely only if it accrued on or after February 18, 2022. (ECF No. 78 at 19; *see* ECF No. 53 (asserting breach of contract claim for the first time on February 18, 2025).) XTI, in contrast, argues that Colorado's six-year provision applies because XTI seeks determinable damages. (ECF No. 82 at 11-12.) "Generally, a debt is deemed

---

[3] Note, however, that "[t]he New York Court of Appeals has not specifically addressed whether a corporation's residence is determined (for purposes of the borrowing statute) by its principal place of business or its state of incorporation." *Luv N' Care, Ltd.*, 703 F. App'x 28 at n.1. Because the parties have forfeited the potential applicability of Delaware law, the Court declines to decide whether Delaware's statute of limitations applies.

liquidated or determinable if the amount due is capable of ascertainment by reference to an agreement or by simple computation." *Timnath Trail LLC v. Town of Timnath*, No. 24CA1372, 2025 WL 1765868, at *5 (Colo. App. June 26, 2025). XTI alleges that Xeriant defaulted on $4.6 million of its total $10 million obligation, an amount "'easily calculable' based on the parties' agreement." *Id.* (quoting *Interbank Invs., L.L.C. v. Vail Valley Consol. Water Dist.*, 12 P.3d 1224, 1230 (Colo. App. 2000)). And XTI asserted its breach of contract claim well within six years of when Xeriant first stopped making payments around December 2021. (ECF No. 53; SAAC ¶ 210.) Accordingly, XTI's claim as to the remaining $4.6 million is timely.

As Xeriant points out, however, XTI alleges other damages resulting from the asserted breach of contract, including "costs and delays incurred in seeking alternative financing for the project, lost business opportunities, and other consequential harm in an amount to be proven at trial." (SAAC ¶ 228.) These damages are likely not ascertainable by simple computation. Consequently, if XTI's claim accrued when Xeriant first stopped making payments in December 2021, recovery on these damages would likely be time-barred under Colorado's default three-year statute of limitations. However, discovery may prove some such damages to be ascertainable by simple computation. Moreover, in a breach of contract claim for monthly payments, failure "to make any one [payment] is a partial, not a total breach," and a claim for relief "accrues with each delinquent performance." *D'Amico v. Smith*, 42 Colo. App. 369, 371 (1979); *see also Liebowitz v. Elsevier Sci. Ltd.*, 927 F. Supp. 688, 706 n.32 (S.D.N.Y. 1996) ("It is well settled . . . that claims for installment payments due under a contract or claims for breaches of a contract calling for a continuing performance . . . accrue as they become due."). At the pleading stage, it is impossible to ascertain whether XTI's subsequent damages resulting from Xeriant's nonpayment accrued between December 2021 and February 18, 2022, or if they

resulted from payment defaults that occurred after February 18, 2022. (*See* ECF No. 53.) Statute of limitations is an affirmative defense, such that "[d]ismissing claims on statute of limitations grounds at the complaint stage 'is appropriate only if a complaint clearly shows the claim is out of time.'" *HLP Props., LLC v. Consol. Edison Co. of New York*, No. 14-CV-01383, 2014 WL 6604741, at *4 (S.D.N.Y. Nov. 21, 2014) (quoting *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999)). Because the complaint does not clearly show the claim is out of time, the Court rejects Xeriant's statute of limitations argument without prejudice.

Accordingly, the motion to dismiss is denied with respect to Count I.[4]

### B. Breach of Fiduciary Duty

In Count II of the SAAC, XTI asserts that Xeriant owed it fiduciary duties of loyalty, good faith, and care with respect to the joint venture and that Xeriant willfully breached its duties by "elevating its own personal interests above the interests of the [joint venture] and XTI." (SAAC ¶¶ 231-32.) In particular, the SAAC alleges that "Xeriant's conduct in connection with the May 17 Letter was a flagrant breach of the duty of loyalty" because it leveraged a potential investment or merger partner for XTI—an opportunity for the joint venture—to "extract a personal benefit for itself" and "secure a side deal guaranteeing itself exorbitant compensation." (*Id.* ¶ 232.) The SAAC also alleges that Xeriant further breached its fiduciary duties by intentionally withholding funding and promised strategic resources. (*Id.* ¶ 233.)

The parties agree that Delaware law governs the fiduciary duty claim. (ECF No. 78 at 21; ECF No. 81 at 14.) "[S]uch implied consent is, of course, sufficient to establish the

---

[4] For the first time in reply, Xeriant argues that XTI does not have the contractual right to receive the $10 million directly because the intended recipient was the LLC jointly owned by Xeriant and XTI. (ECF No. 83 at 3-4.) "It is well established, of course, that arguments first raised in reply briefs are forfeited or waived." *Chevron Corp. v. Donziger*, 325 F. Supp. 3d 371, 379 n.21 (S.D.N.Y. 2018). The Court therefore does not consider this forfeited argument.

applicable choice of law." *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 514 n.4 (2d Cir. 2001); *see also FMS Bonds, Inc. v. Bank of New York Mellon*, No. 15-CV-9375, 2016 WL 4059155, at *13 n.11 (S.D.N.Y. July 28, 2016) (noting that such agreement "avoids the potentially complex question" of whether a fiduciary duty claim arises from a contract or whether it sounds in tort).  Accordingly, the Court applies Delaware law.

"To establish liability for the breach of a fiduciary duty, a plaintiff must demonstrate that the defendant owed her a fiduciary duty and that the defendant breached it." *Est. of Eller v. Bartron*, 31 A.3d 895, 897 (Del. 2011).  XTI satisfies this test at the pleading stage.  First, XTI has plausibly alleged that Xeriant owed it a fiduciary duty.  Delaware courts have consistently held that joint venturers owe each other "a fiduciary duty of utmost good faith, fairness and honesty with respect to their relationship to each other and to the enterprise." *In re Arthur Treacher's Fish & Chips of Ft. Lauderdale, Inc.*, 386 A.2d 1162, 1166 (Del. Ch. 1978).  "A joint adventure has been broadly defined as an enterprise undertaken by several persons jointly to carry out a single business enterprise, not amounting to a partnership, for their mutual benefit, in which they combine their property, money, effects, skill and knowledge." *J. Leo Johnson, Inc. v. Carmer*, 38 Del. Ch. 579, 584 (1959).  "To create such a relationship, there must be (1) a community of interest in the performance of a common purpose, (2) joint control or right of control, (3) a joint proprietary interest in the subject matter, (4) a right to share in the profits, (5) a duty to share in the losses which may be sustained." *Warren v. Goldinger Bros.*, 414 A.2d 507, 509 (Del. 1980) (quotation marks omitted).  The SAAC plausibly alleges each element of a joint venture, as the Agreement expressly provides for a shared purpose, shared control and management of the joint venture, 50/50 ownership, a right to share in the profits through

increased equity, and shared exposure to losses through financing, sunk costs, and reliance on promised funding and resources. (*See, e.g.*, SAAC ¶¶ 206-09.)

Second, XTI has plausibly alleged that Xeriant breached its fiduciary duty in connection with the introduction to Inpixon and the terms of the May 17 Letter. A fiduciary duty "forbids one joint adventurer from acquiring solely for himself any profit or secret advantage in connection with the common enterprise." *J. Leo Johnson, Inc.*, 38 Del. Ch. at 584. Thus, "with respect to the property subject to the duty, a fiduciary always must act in a good faith effort to advance the interests of his beneficiary." *In re Mobilactive Media, LLC*, No. 5725-VCP, 2013 WL 297950, at *20–21 (Del. Ch. Jan. 25, 2013) (quotation marks omitted). In support of the joint venture, Xeriant had a duty "to negotiate in [XTI's] best interest" when it came to potential financial partners and mergers, but instead Xeriant "negotiated [its] own, favorable . . . package" to introduce XTI to Inpixon, at the expense of XTI. *Ulrich v. O'Keefe*, No. 23-CV-686, 2024 WL 1313875, at *4 (S.D.N.Y. Mar. 26, 2024) (applying Delaware law).

Xeriant contests the existence of a fiduciary relationship, arguing that XTI made only conclusory allegations as to shared profits and losses. (ECF No. 78 at 23-24.) But as discussed above, the SAAC makes particularized allegations about the joint venture, supported by the terms of the Agreement, that evince shared profits (through any increase in equity) and shared losses (through financing from Xeriant and resources and sunk costs from XTI). Xeriant also argues that the joint venture's resulting LLC, Eco-Aero LLC, was governed by an operating agreement that disclaims a joint venture relationship. (*Id.* at 26.) The Eco-Aero operating agreement is mentioned only once in the SAAC, in the answer portion, and the SAAC does not rely on its terms and effects. (SAAC ¶ 29.) Thus, it is likely inappropriate for consideration at the motion to dismiss stage. *See Universal Surv. Ctr., Inc. v. Precision Opinion, Inc.*, No. 16-

CV-8259, 2017 WL 11615247, at *2 (S.D.N.Y. Feb. 8, 2017) (holding that a document "briefly reference[d]" in a counterclaim was not incorporated). In any event, as XTI argues, the terms of the operating agreement on which Xeriant relies do not preclude a joint venture or fiduciary relationship. Section 2.7 of the operating agreement only clarifies that no member of the LLC is a "joint venturer of any other Member *by virtue of this Agreement*." (ECF No. 78-1 § 2.7 (emphasis added).) Likewise, Section 5.6 merely limits personal liability for actions taken by individual managers. (*Id.* § 5.6.) Although neither provision creates a fiduciary duty, it is also true that neither provision *eliminates* such a duty. *See, e.g.*, *Paige Cap. Mgmt., LLC v. Lerner Master Fund, LLC*, No. CIV.A. 5502-CS, 2011 WL 3505355, at *32 (Del. Ch. Aug. 8, 2011) (noting "the basic requirement that any contractual displacement of the fiduciary duties of loyalty and care be made with clarity").

Xeriant also argues that, assuming it had a fiduciary duty to XTI, that duty was not breached by the conduct surrounding the May 17 Letter. (ECF No. 78 at 22.) Again, Xeriant relies on the Eco-Aero operating agreement, which is arguably not part of the record at the pleading stage. In any event, the relevant term of the operative agreement does not foreclose a breach. Section 4.8 of the operating agreement simply provides that it does not prevent any member "from engaging in any other activities or businesses, unless those activities or businesses are directly competitive with the Business," and disclaims that no members are "obligated to inform . . . the other Member of any business opportunity of any type or description." (ECF No. 78-1 § 4.8.) But XTI's allegation is not that Xeriant failed to inform it of a business opportunity—rather, it is that Xeriant leveraged the business opportunity in its own self-interest to gain a benefit to the detriment of XTI and the joint venture. (SAAC ¶ 232.)

13

Lastly, Xeriant argues in a footnote that the fiduciary claim is duplicative of XTI's contract claim. (ECF No. 78 at 27 n.14.) But at the pleading stage, XTI has plausibly pled a fiduciary duty claim independent of its contract claim. XTI's fiduciary duty claim relies on Xeriant's conduct in obtaining the May 17 Letter. Such conduct—leveraging a business opportunity for financial gain—is not explicitly prohibited by the Agreement and may potentially result in damages separate and apart from the breach of contract claim. (*See* SAAC ¶ 232-35.) Thus, "Plaintiff['s] fiduciary duty claim is based on additional facts . . . , is broader in scope, and involves different considerations in terms of a potential remedy than [its] contract claims." *Veloric v. J.G. Wentworth, Inc.*, No. CIV.A. 9051-CB, 2014 WL 4639217, at *19 (Del. Ch. Sept. 18, 2014) (cleaned up).

Accordingly, the motion to dismiss is denied with respect to Count II.

C. **Declaratory Judgment**

Count III of the SAAC seeks declaratory judgment from this Court declaring that: the May 17 Letter has expired by its terms and is invalid and unenforceable; the Agreement has been terminated due to Xeriant's breach and by the Agreement's own terms; all technology and intellectual property developed through the joint venture has reverted exclusively to XTI; and Xeriant has no further rights or interests in the VTOL Technology or any joint venture assets. (SAAC ¶ 240.)

Xeriant's brief spends little time on the declaratory judgment claim and largely relies on its arguments as to XTI's other claims. (ECF No. 78 at 27-28.) But for the reasons stated above, the statute of limitations does not preclude XTI's breach of contract claim at the pleading stage and therefore does not affect XTI's declaratory judgment claim. In a line, Xeriant additionally asserts that a declaration as to the enforceability of the May 17 Letter "is in the nature of an affirmative defense," as it responds to Xeriant's own breach of contract claim. (*Id.*) This

mischaracterizes XTI's declaratory claim, which does not seek to merely defeat Xeriant's breach of contract claim but to secure a judgment protecting XTI from future claims that may arise if the enforceability of the May 17 Letter were left undecided. "[A] counterclaim is not duplicative or redundant if it asserts an independent case or controversy that survives dismissal of the plaintiff's claim." *Marvel Worldwide, Inc. v. Kirby*, 756 F. Supp. 2d 461, 467 (S.D.N.Y. 2010). Because a favorable declaration would "protect [XTI] from future litigation," the declaratory counterclaim alleges an independent cause or controversy separate from Xeriant's claim. *Id.* "Declaratory judgment on this issue in this action would thus serve a useful purpose and offer relief from uncertainty." *Solid Oak Sketches, LLC v. 2K Games, Inc.*, No. 16-CV-724, 2017 WL 11709196, at *2 (S.D.N.Y. May 16, 2017) (quotation marks omitted).

Accordingly, the motion to dismiss is denied with respect to Count III.

**IV.   Conclusion**

For the foregoing reasons, Xeriant's motion dismiss the SAAC is DENIED. Xeriant's motion to dismiss XTI's amended answer and counterclaim is also DENIED as moot.

Xeriant shall file an answer to the Second Amended Answer and Counterclaim within 14 days after the date of this Opinion and Order.

The Clerk of Court is directed to close the motions at Docket Numbers 60 and 77.

SO ORDERED.

Dated: September 23, 2025
       New York, New York

_____
J. PAUL OETKEN
United States District Judge